FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

' 2014 OCT 21 P 5: 02

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

ORBITAL SCIENCES CORPORATION,     :

               Plaintiff,     :

         v.     :

INTEGRATED SYSTEMS &     :
MACHINERY, LLC (INSYSMA) and     :
KEVIN C. HUBER,     :
           Defendants.     :

Case No. *1:14CV1378*
*AJT/TBC*

## COMPLAINT

### Introduction

1. Plaintiff, Orbital Sciences Corporation ("Orbital"), by counsel, brings this action against

   defendants, Integrated Systems & Machinery, LLC ("INSYSMA") and Kevin C. Huber

   ("Huber"), (together "Defendants"), for *inter alia*, preliminary and permanent injunctive

   relief in the form of specific performance of INSYSMA's obligations under its contract with

   Orbital; for INSYSMA's breach of its contract including its breach of warranty to Orbital,

   and for Defendants' misrepresentations and/or concealment of material facts leading Orbital

   to enter into the contract and subjecting Orbital to significant harm due to Defendants'

   misrepresentations and/or concealment.

2. Orbital seeks equitable relief in the form of specific performance by way of preliminary and

   permanent injunction requiring Defendants to release for delivery to Orbital critical and

   unique equipment and data (*i.e.,* Cylinders, Gimbals, Cradles and the End Item Data

   Package[1]) to enable Orbital to complete an upgrade of its launch facility needed to launch

---

[1] Hereinafter the "End Item Data Package" is referred to as "Data".

the Antares launch vehicle used to re-supply the International Space Station ("ISS") to fulfill its contracts with the National Aeronautics and Space Administration ("NASA") and the Commonwealth of Virginia.

### Parties

3. Orbital is a Delaware corporation authorized to transact business in the Commonwealth of Virginia, which is Orbital's principal place of business. Orbital is a company which specializes in the manufacturing and launch of satellites and launch vehicles.

4. INSYSMA is a Nevada limited liability company, organized by Huber, with its principal place of business located at 22 Aberdeen Road, Smithtown, NY 11787.

5. Huber is an individual resident of the State of New York, and holds the position of Vice President and Managing Member of INSYSMA.

6. Orbital, INSYSMA, and Huber are referred to herein collectively as the "Parties."

### Jurisdiction and Venue

7. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and there is complete diversity between the Plaintiff and the Defendants.

8. This Court further has jurisdiction pursuant to 28 U.S.C. § 2201 to render a declaratory judgment between the Plaintiff and the Defendants.

9. This Court has personal jurisdiction over Defendants as a result of Defendants' agreement and substantial contacts within this District. Among numerous other substantial contacts, Huber on behalf of INSYSMA engaged in negotiations in Virginia with Orbital, a Virginia resident, and visited on numerous occasions the MARS launch site at Wallops Island, Virginia for the purpose of fraudulently inducing Orbital to enter into the contract at issue,

in Virginia.  INSYSMA, through Huber, entered into a firm fixed price subcontract Number

1021300039, effective March 20, 2013 ("Subcontract"), a copy of which is attached hereto

as Exhibit "A"[2], which provides:

> (a)      Any dispute arising out of or relating to this Subcontract,
> shall be adjudicated in a court of competent jurisdiction within the
> Commonwealth of Virginia.  The parties each agree to irrevocably
> submit and consent to the exclusive jurisdiction and venue of
> courts located in Virginia and waive their rights to challenge the
> personal jurisdiction of those courts over it. (Attachment 1,
> Section 10)

10.  Venue is proper in this District pursuant to 28 U.S.C. § 1391, in that this action arises out

of a contract made between the Plaintiff and Defendant INSYSMA which was executed

and delivered by Defendant Huber to Plaintiff in the Commonwealth of Virginia. Plaintiff

was a resident of this Commonwealth and this District, within the Alexandria Division,

when the events giving rise to Plaintiff's claim took place.

11.  Venue is also proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the

events giving rise to this action occurred within this District and property that is at the

center of the controversy and the subject of the contract at issue, the TELHS launch site, is

located within this District.

12.  Venue is also proper pursuant to the agreement of the parties as set forth in the contract at

issue herein. See Exhibit A, Attachment 1, Section 10 at p.3.

## Background

13.  In February 2008, NASA and Orbital entered into a cooperative agreement for

Commercial Orbital Transportation Services ("COTS"), pursuant to which Orbital agreed

---

[2] The Subcontract includes five attachments which are expressly incorporated as part of the Subcontract.
Attachments one, two and three are included at Exhibit A, while attachments four and five consist of technical
drawings and are available for view as needed upon request.

to develop and test a space transportation system for delivering cargo to the International Space Station.

14. In December 2008, NASA awarded Orbital a contract for Commercial Resupply Services ("CRS") for eight cargo missions to the ISS from Wallops Island, Virginia.

15. Orbital has completed its obligations under the COTS agreement and is performing its obligations under the CRS agreement through launch services from Wallops Island, Virginia using Orbital's Taurus II launch vehicle, which has been renamed "Antares."

16. It is through the CRS contract that Orbital resupplies NASA's astronauts and the ISS with necessary and indeed critical goods, such as food, personal items, parts and materials for repairs, science experiments and research projects.

17. The first Antares mission for NASA—the "test" flight—launched from the Mid-Atlantic Regional Spaceport ("MARS") located on Wallops Island, in Accomack County, Virginia in April 2013. The Virginia Commercial Space Flight Authority ("VCSFA") is an entity owned by the Commonwealth of Virginia (the "Commonwealth"), which operates MARS.

18. The second Antares mission—the "Demonstration" or "Demo" mission—occurred from MARS on September 18, 2013; the third Antares (Orb-1) launch for NASA occurred January 9, 2014, and the fourth launch (Orb-2) occurred on July 13, 2014. The fifth launch is scheduled for late October, 2014.

19. Consistent with its agreement with NASA, Orbital is under contract to perform at least two Antares launches a year at MARS through at least 2016.

20. Certain construction and other improvements at MARS were necessary in order to accommodate launches of the Antares and other similar launch vehicles, including a

system that would transport the integrated Antares launch vehicle to the launch pad and raise the Antares into launch position.

21. The mechanism that was constructed consists of two systems, which are the Transporter/Erector/Launcher ("TEL") and the Hydraulic System ("TELHS").

22. The TEL is an indispensable machine that consists of a flatbed vehicle upon which Orbital's launch vehicle is assembled for liftoff, and which transports the launch vehicle to the launch pad. The TELHS raises the TEL and launch vehicle from a horizontal position to a vertical position for launch, holds the launch vehicle and the TEL in the vertical launch position for 24 hours prior to the launch, and then quickly retracts upon liftoff of the launch vehicle.

23. Orbital was assisted by vendors who helped to engineer and build the TEL and TELHS. One such vendor was Advanced Fluid Systems, Inc. ("AFS") which supported the integration and launch of the Antares launch system and specifically supported the design and development of the Hydraulic Power System for the TELHS.

24. Huber was employed by AFS as a full-time salesman and engineer from November, 2006 through October 26, 2012 while AFS supported Orbital in the design and development of the Hydraulic Power System for the TELHS.

25. In October, 2012, Huber organized INSYSMA, while still employed by AFS. (See AFS' Statement of Material Facts[3], Exhibit B to the Complaint, Paragraph 6)

26. Unbeknownst to Orbital at the relevant time, Huber while still employed by AFS backed up numerous AFS files and downloaded numerous and various AFS files from the AFS

---

[3] AFS has recently filed with the court in the AFS Action a motion for summary judgment on liability, including its claims against INSYSMA and Huber. This Statement of Material Facts was attached in support of and was made a part of the AFS motion.

server without AFS' consent, provided these files to INSYSMA, and Defendants used
those AFS files and misrepresented those files as their own in order to secure work from
Orbital. (See Exhibit B)

27.  The fraudulent conduct of Huber and INSYSMA is thoroughly documented by AFS'
Statement of Material Facts, attached hereto as Exhibit B, which is derived largely from
expert forensic reconstruction of Huber's AFS-issued laptop, Huber's external hard drive,
emails, and Huber's mobile phone records.

28.  For example, the Statement of Material Facts reveals:

   • "On October 5, 2012, (while still an AFS employee) Huber began work on a 16-
     page document to be submitted jointly by L&H[4] and Huber (through his new
     company, INSYSMA) to Orbital for a ROM ("Rough Order of Magnitude") for
     the enhanced TELHS cylinder work.  A ROM proposal is a key document for
     ultimately being selected as the vendor and obtaining a purchase order. L&H and
     Huber collaborated on this document between October 5 and November 2, 2012,
     with L&H emailing the completed ROM to Orbital on November 2, 2012, as
     described below." (See Exhibit B, Paragraph 72)

   • "The version of this document that Huber created on October 5th is Ex. 43 hereto.
     Huber postdated it to October 20[th], but metadata confirms its actual creation date
     as October 5th. Ex. 3. The fact that Huber cut and pasted this document from an
     AFS original is demonstrated by the fact that Huber forgot to eliminate "AFS"
     from various sections. *See, e.g.* p. 8, middle paragraph ("From knowledge and
     experience, AFS feels this setup directly provides the best possible control &

---

[4] L&H is a co-defendant with Huber and INSYSMA in the AFS Litigation.

stability of the cylinders at any speed or loading condition")." (See Exhibit B, Paragraph 73)

- "On October 15, 2012 (while still an AFS employee), Huber drafted a pricing proposal for the Orbital cylinder upgrades, reflecting collaboration between L&H and Huber's new company, INSYSMA. Ex. 44. Huber postdated this document as November 10, 2012 (the day after his then-scheduled departure date from AFS of November 9, 2012, see ¶¶ 11, 13 above). However, metadata confirms a modification date of October 15, 2012. Ex. 3." (See Exhibit B, Paragraph 74)

- "Both the documents created on October 5[th] and on October 15th reflect two alternatives that Huber was discussing with Orbital on behalf of L&H and INSYSMA. One was to replace just the cylinder heads and gimbals. The other was to replace the cylinders as well as the heads and gimbals. Exs. 2, 3. The ROM jointly submitted to Orbital by L&H and INSYSMA on November 2, 2012 set forth both alternatives. To prepare this ROM, L&H needed to know everything it could about the existing cylinders, cylinder heads and gimbals as they were currently designed and built." (See Exhibit B, Paragraph 75)

- "Therefore, Huber and L&H engaged in extensive sharing of critical AFS drawings, diagrams, and other confidential data for the Antares TELHS. At least **eight sets** of the highest-level AFS data, constituting voluminous files, were misappropriated and shared by Huber and L&H." (See Exhibit B, Paragraph 76)

**INSYSMA Subcontract With Orbital**

29.  Following the first five launches, through October, 2014 as identified above, Orbital's

future resupply missions launched from MARS would each feature longer and heavier

launch vehicles carrying heavier payloads that would necessarily in total weigh

approximately 30,000 lbs. more than the earlier launch vehicles plus payloads.

30.  In consultation with VCSFA, Orbital determined that the TELHS should be upgraded with

stronger Cylinders and Gimbals at the base of the TELHS to better accomplish the lifting

of the more heavily loaded Antares launch vehicle. Orbital also determined that new

shipping cradles were needed to allow shipment of the new cylinder/gimbal assemblies.

31.  On behalf of INSYSMA, Huber negotiated with Orbital in Virginia for the opportunity to

provide these services and components to upgrade the TELHS.

32.  In negotiations with Orbital, Huber concealed the fact that he had backed up and relied

upon various proprietary AFS files and downloaded various proprietary AFS files from

the server of AFS without AFS' knowledge and consent, and provided these files to

INSYSMA.  Instead Huber assured Orbital that he and INSYSMA were able to perform

all work contemplated by the Subcontract in a timely and efficient manner independent of

AFS.

33.  Upon information and belief recently acquired, Defendants instead relied at least in part

upon the misappropriated proprietary documents and information of AFS when

representing Defendants' ability to Orbital. (Exhibit B, Paragraphs 72-116)

34.  Orbital entered into the Subcontract with INSYSMA, effective March 20, 2013, in which

INSYSMA, through Huber, agreed to support Orbital's efforts to replace the hydraulic

cylinders and corresponding gimbals and other components of the TELHS with upgraded

Cylinders, Gimbals and Cradles. At all times Defendants knew that time was of the essence in the performance of the Subcontract and in particular the delivery of the Cylinders, Gimbals, Cradles and Data.

35. Under the terms of the Subcontract, in exchange for certain work performed to Orbital's satisfaction, and the timely delivery of certain components by INSYSMA, Orbital agreed to pay INSYSMA a maximum of $2,028,966.00 in accordance with the terms and the schedule stated in the Subcontract. Not all work originally contemplated under the Subcontract has been performed.

36. Defendants have completed the work necessary on the Cylinders, Gimbals, Cradles and Data for delivery, and Orbital has agreed to pay Defendants for the work completed upon delivery of the Cylinders, Gimbals, Cradles and Data to Orbital, but Defendants have refused to release the Cylinders, Gimbals, Cradles and Data to Orbital. (See, email from Kevin Huber dated 07/14/2014 attached as Exhibit C)

37. Orbital has the right under the Subcontract to terminate the contract for cause based up Defendants' fraudulent conduct, misrepresentations and breach of warranty under the Subcontract.

**AFS Litigation**

38. On December 23, 2013 AFS filed a civil action in the United States District Court for the Middle District of Pennsylvania captioned *AFS v. Kevin Huber, et al.*, No. 1:13-cv-03087-CCC ("AFS Action") in which it named as defendants, *inter alia*, Orbital, INSYSMA, and Huber.

39. At the crux of the AFS Action are AFS' allegations that Huber and INSYSMA had unlawfully co-opted information and documents from AFS, during Huber's employment

at AFS and after his separation from AFS, *inter alia*, in order to obtain Orbital's work as provided in the Subcontract, and to enable Huber and INSYSMA to perform the services under the Subcontract with Orbital.

40. In connection with the AFS Action, Huber has admitted to misappropriating information and documents from AFS prior to his separation from employment with AFS. (See Exhibit B at Paragraph 8)

41. AFS named Orbital as a defendant as a result of Huber's and INSYSMA's unauthorized taking of information and documents from AFS and entering into the Subcontract with Orbital.

42. Through the AFS Action, Orbital learned for the first time of the conduct of Huber and INSYSMA in misappropriating documents and information from AFS as identified in the Complaint of the AFS Action and as substantiated by forensic analysis of Huber's AFS-issued laptop. (See Exhibit B)

43. Ultimately, AFS and Orbital reached a confidential settlement agreement in May, 2014 through which Orbital was released from the claims of the AFS Action.

44. AFS was granted leave to file a second amended complaint in the AFS Action, in which AFS amended its allegations by removing all previous allegations against Orbital.

45. The AFS Action remains pending as against Huber and INSYSMA and other defendants. AFS has moved for summary judgment on liability in the AFS Action against Huber and INSYSMA.

### INSYSMA's Representations and Performance Under the Subcontract

46. Under the Subcontract, INSYSMA made representations and warranties that Orbital relied upon when awarding the Subcontract to INSYSMA.

47. INSYSMA promised, *inter alia*, to "comply with all applicable Federal laws and regulations regarding ethics in public acquisitions and procurement and performance of contracts."

48. INSYSMA also promised to provide to Orbital certain unique equipment – in particular Cylinders, Gimbals, Cradles and Data specially manufactured to Orbital's specifications - to upgrade the TELHS hydraulic system.

49. The Cylinders, Gimbals and Data have been manufactured by INSYSMA's suppliers, and two of the four the Cradles have been received by Orbital.  But INSYSMA has failed and refused to deliver the Cylinders, Gimbals, two of the four Cradles and Data to Orbital.

50. Orbital has paid INSYSMA for all work completed and invoiced by INSYSMA to date and has agreed to pay INSYSMA for the work completed on the Cylinders, Gimbals, the two remaining Cradles and Data upon delivery to Orbital.

51. While the Subcontract contemplated that certain components would be removed from the old cylinders would also be reintegrated into the new Cylinders, due to Defendants' fraud and breach of warranty under the Subcontract, Orbital determined that it needed to terminate any further work by INSYSMA under the Subcontract so that this additional work is not necessary for INSYSMA to complete, and Orbital is prepared to accept the Cylinders, Gimbals, the two remaining Cradles and Data and pay for the work completed to date.

52. Orbital has requested delivery of the Cylinders, Gimbals, the two remaining Cradles and Data, and is ready and willing to pay for the equipment and Data so Orbital may complete the upgrade of the TELHS as necessary to accomplish future launches of the Antares, but

Defendants are holding the vital and unique equipment hostage. (See, email from Kevin Huber dated 07/14/2014 attached as Exhibit C)

53. As a result of Defendants' conduct as outlined herein, INSYSMA also breached its representations and warranties under the Subcontract. Specifically, Paragraph 18(a) of the Subcontract's terms and conditions provides that "[INSYSMA] warrants that the Work performed or delivered under this Subcontract will not infringe or otherwise violate the intellectual property rights of any third party in the United States or any foreign country."

54. Upon Orbital's information and belief, as detailed by AFS' recently filed Motion for Summary Judgment and accompanying Statement of Material Facts at Exhibit B to this Complaint, Defendants infringed upon and violated the intellectual property rights of AFS and did so in direct connection with Defendants' attempts to procure the Subcontract with Orbital. See for example paragraphs 61-116 of Exhibit B.

55. Accordingly, with the knowledge that it will not be permitted to do the remaining work under the Subcontract, Defendants apparently intend to hold hostage Orbital's necessary equipment and Data in order to attempt to force Orbital to allow INSYSMA to complete further work, or to pay for work which INSYSMA has not and will not perform.

56. Defendants are aware that without integrating the Cylinders and Gimbals to upgrade the TELHS, Orbital will be unable to modify the Antares launch vehicle for upcoming launches to supply the ISS with the requisite payloads.

57. The Antares is scheduled to transport equipment and supplies to the ISS on the following launch dates: ORB 3, late October, 2014; ORB 4, April 1, 2015; and ORB 5, May 31, 2015.

58. Pursuant to a written agreement between Orbital and the Commonwealth of Virginia, Orbital must remove the current cylinders and gimbals and install and integrate the new Cylinders and Gimbals into the TELHS prior to ORB 4. This effort will take approximately four months, and thus, there is little time left before Orbital will need the equipment that INSYSMA is holding hostage.

59. Should INSYSMA not be ordered to immediately deliver to Orbital the completed Cylinders, Gimbals, the two remaining Cradles and Data, currently in Defendants' possession/control, Orbital will suffer irreparable harm not compensable by legal remedies because Orbital will not be able to timely complete the necessary modifications.

60. The Cylinders, Gimbals, Cradles and Data were specially manufactured or prepared for the TELHS upgrade according to Orbital's specifications and are unique in that no other such Cylinders, Gimbals, Cradles and Data are available.

61. Orbital is unable to re-procure the special manufacture of the unique Cylinders, Gimbals, Cradles and Data in time to accomplish the upgrades without interfering with or canceling altogether the scheduled launches of the Antares. Accordingly, the delivery of necessary equipment and supplies to the ISS may be impermissibly delayed, for which there is no adequate remedy at law. Further, the mission of the ISS could be significantly impacted, and Orbital's reputation in the industry, its ability to compete and deliver, and the confidence of its customers and partners (i.e. NASA, VCSFA and the Commonwealth of Virginia) would be seriously damaged.

62. Further delay would also increase exponentially Orbital's resulting harm stemming from Defendants' conduct, which harm would dwarf any conceivable harm that might be

claimed by INSYSMA as a result of delivering the Cylinders, Gimbals, Cradles and Data in exchange for payment by Orbital for the work performed on them to date.

## Claims for Relief

### COUNT I
### Breach of Contract – INSYSMA

63. Orbital incorporates and reaffirms all the allegations made in the preceding paragraphs, 1 through 62 as if same were fully set forth herein.

64. By its conduct, INSYSMA breached its representations and warranties provided in the Subcontract at Attachment 1, paragraph 18, when it infringed upon the intellectual property rights of AFS directly in connection with Defendants' efforts to obtain Orbital's business, and to perform the work and services called for under the Subcontract. This conduct was revealed by forensic analysis of Huber's AFS-issued laptop, telephone records, external hard drive and emails, and is detailed in the AFS Statement of Material Facts, attached hereto as Exhibit B.

65. By its conduct, INSYSMA breached its representations and warranties provided in the Subcontract at Attachment 2, Section 2(d) wherein it promised to "comply with all applicable Federal laws and regulations regarding ethics in public acquisitions and procurement and performance of contracts" in that INSYSMA received from Defendant Huber, and used proprietary information and documents belonging to a competitor without the competitor's knowledge, employed the competitor's proprietary documents and information in obtaining the Subcontract, and concealed this conduct from Orbital.

66. INSYSMA's breaches have damaged Orbital by, *inter alia*, resulting in Orbital incurring legal fees and expenses in connection with the AFS Action and the current action, causing

a delay of the upgrades of the TELHS, and jeopardizing Orbital's ability to provide launch services at MARS.  As a result of INSYSMA's breaches, Orbital has been harmed and will continue to be harmed.

## COUNT II
### Specific Performance-INSYSMA

67.  Orbital incorporates and reaffirms all the allegations made in the preceding paragraphs, 1 through 66 as if same were fully set forth herein.

68.  Virginia Code § 8.2-716 provides that (1) specific performance may be decreed where the goods are unique or in other proper circumstances, and (2) the decree for specific performance may include such terms and conditions as to payment of the price, damages, or other relief as the court may deem just.

69.  Orbital seeks specific performance in the form of release and delivery of the unique Cylinders, Gimbals, two Cradles and Data to Orbital, which Defendants admit are ready for delivery to Orbital. (See Exhibit C attached)

## COUNT III
### Fraudulent Inducement – Kevin Huber and INSYSMA

70.  Orbital incorporates and reaffirms all the allegations made in the preceding paragraphs 1 through 45 as if same were fully set forth herein.

71.  By their conduct, Defendants fraudulently induced Orbital to enter into the Subcontract.

72.  Defendants made misrepresentations to Orbital by their failure to inform Orbital that they had stolen proprietary documents and information from AFS, Huber's former employer and INSYSMA's direct competitor, and had used AFS' misappropriated intellectual property to draft a proposal to Orbital concerning the scope of the work of the proposed

Subcontract, and to convince Orbital to enter into the Subcontract, and to carry out the Subcontract with Orbital. (See Exhibit B)

73. Defendants' conduct of misappropriating proprietary documents and information from AFS was known to the Defendants before entering into the Subcontract, but was not known to Orbital and was not information that was equally accessible to Orbital.

74. Defendants represented to Orbital that they were capable of performing the duties of the subcontract independent of AFS, and concealed their misappropriation and use of AFS' documents and information so as to procure the Subcontract with Orbital.

75. Defendants had a greater level of expertise than Orbital had with regard to the work and knowledge necessary for manufacture and supply of the components.

76. Defendants actively concealed their misappropriations from Orbital.

77. Orbital relied upon Defendants' misrepresentations to its detriment. Had Orbital known that Defendants had misappropriated proprietary documents and information from AFS, or had used those documents and information in connection with attempting to gain Orbital's business, Orbital would not have entered into the Subcontract with INSYSMA.

78. Defendants' conduct has harmed Orbital, and specifically Orbital has been significantly harmed in working with Defendants to enter into the Subcontract and carry out its terms.

79. Defendants' conduct has caused Orbital significant delay through Orbital's resulting inability to make timely and necessary upgrades to the TELHS and to therefore launch longer and heavier launch vehicles and payloads as planned.

80. Defendants' conduct has harmed and will continue to harm Orbital.

## COUNT IV
### Indemnity - INSYSMA

81.   Orbital incorporates and reaffirms all the allegations made in the preceding paragraphs 1 through 80 as if same were fully set forth herein.

82.   Article J of the Subcontract incorporates and makes a part of the Subcontract, *inter alia*, Attachment 1 which includes Standard Terms and Conditions.

83.   Pursuant to paragraph 15 of the Subcontract's Standard Terms and Conditions, INSYSMA agreed to defend, indemnify, and hold harmless Orbital from any and all claims, demands, suits, actions, loses, liabilities, damages, costs and expenses, including attorney fees, arising from or connected with any act or omission of INSYSMA or Huber.

84.   Defendants' conduct and misrepresentations of same to Orbital caused Orbital to enter into the Subcontract with INSYSMA, and was the proximate cause for Orbital to become entwined in the AFS Action as a defendant.

85.   Orbital was forced to incur legal fees and expenses, and to suffer interruption of business, in order to defend itself against unfounded allegations of fraud and conspiracy with Huber and INSYSMA directly stemming from Huber and INSYSMA's unlawful taking of AFS's proprietary information and documents.

## COUNT V
### Declaratory Judgment

86.   Orbital incorporates and reaffirms all the allegations made in the preceding paragraphs 1 through 85 as if same were fully set forth herein.

87.   Based upon Defendants' breaches of duties under the Subcontract and Defendants' fraudulent conduct as more fully described in previous paragraphs, there exists an actual controversy, and Orbital is entitled to a declaratory judgment from this Court that Orbital

has the right to terminate the Subcontract upon receipt of the Cylinders, Gimbals, Cradles

and Data from Defendants.

### Prayer for Relief

Orbital Sciences Corporation respectfully prays that this Court enter an order:

- granting injunctive relief, both preliminary and permanent in the form of specific performance of the Subcontract's requirement that INSYSMA immediately deliver to Orbital the Cylinders, Gimbals, Cradles and Data under Virginia Code § 8.2-716 and Virginia common law;

- granting judgment in its favor and against INSYSMA on Count I for breach of contract;

- granting judgment in its favor and against INSYSMA on Count II for specific performance;

- granting judgment in its favor and against Huber and INSYSMA on Count III for their fraudulent conduct;

- granting judgment in its favor against INSYSMA on Count IV that Orbital is entitled to indemnification;

- granting Orbital a judgment that it has the right to terminate the Subcontract upon receipt of the Cylinders, Gimbals and Cradles from Defendants without further obligation to Defendant INSYSMA under the Subcontract; and

- granting such further relief as this Court deems proper.

ORBITAL SCIENCES CORPORATION
By Counsel

Dated:  October 21, 2014

_____
Allison L. Barnes, III (Va. Bar No. 30458)
Wiley Rein LLP
1776 K Street NW
Washington, DC 20006
Tel: 202.719.7385
Fax: 202.719.7049
Email: abarnes@wileyrein.com

Pro hac vice admission sought:

Joseph M. Donley
Christopher J. Day
CLARK HILL PLC
One Commerce Square
2005 Market Street, Suite 1000
Philadelphia, PA 19103
Email: jdonley@clarkhill.com
Phone: (215) 640-8500
Fax: (215) 640-8501

*Counsel for Defendant,*
*Orbital Sciences Corporation*